We will hear argument this morning in Case 2512, National Collegiate Athletic Association v. Alston and the Consolidated Case. Mr. Waxman? Good morning, Mr. Chief Justice, and may it please the Court. For more than 100 years, the distinct character of college sports has been that it's played by students who are amateurs, which is to say that they are not paid for their play. Maintaining that distinct character is both pro-competitive, because it differentiates the NCAA's product from professional sports, and can be achieved only through agreement. The lower courts agreed that the NCAA's conception of amateurism is pro-competitive, but in striking down several of the rules, they made two fundamental errors. First, they defined their own, quote, much narrower conception of amateurism, to mean only that athletes not be paid unlimited amounts unrelated to education. And they then imposed a regime that permits athletes to be paid thousands of dollars each year just for playing on a team, and unlimited cash for, quote, post-eligibility internships. That manifestly preserves neither the NCAA's demarcation between college and professional sports, nor even the lower courts, because whatever their labels, these new allowances are akin to professional salaries. Especially given the truly unique history here, a rule that is reasonably designed to preserve amateurism as the NCAA has defined it should be upheld. Rules that do not enforce the amateur status of athletes, by contrast, may be subject to detailed scrutiny. Decades of judicial experience show that that distinction is both sensible and administrable, and the alternative is perpetual litigation and judicial superintendents, as the past 12 years in the Ninth Circuit so vividly illustrate and portend. Thank you. Mr. Waxman, do you want us to apply the so-called quick-look approach in evaluating these restrictions? Is that right? That's right in this sense. And let me just say, Mr. Chief Justice, first of all, look, we understand that there's been a trial here, and we are perfectly prepared to explain, as we've tried to in our briefs, why notwithstanding the trial, reversal is required, and the antitrust laws do not permit the court to impose the decree that it did. But we think that in order to avoid the situation that we currently have, where we have endless line drawing and judicial supervision punctuated by requests for treble damages, it's important for the court to speak clearly here. And I will say that given that we have what the government acknowledges is a truly unique situation in which we have a product that is defined by the restraint on competition, it is perfectly appropriate and necessary for the court to examine in whatever detail is necessary whether the product that's produced really is pro-competitive. Well, but your friend on the other side says we've never used the quick look doctrine to uphold restrictions, only to strike them down. Well, look, quick look is a particular phrase. We haven't used it, but this court has made clear that the rule of reason represents a continuum of scrutiny, as the court explained in Cal Dental. The court needs to determine the inquiry meet for the circumstances. This court recognized the fact that in section six of American Needle, that a form of quick look or abbreviated review may well be appropriate to uphold the very kind of rules that are at issue here. And more broadly, Mr. Chief Justice, in antitrust cases like Brook Group and Trinco, the court has adopted clear standards that a plaintiff must meet in order to overcome dismissal. And the rationale for the approach that we advocate is similar to what prompted the court in those other circumstances to impose such a deferential review. I think maybe, Mr. Waxman, the one limitation that is the most troublesome is, or lack of limitation, I guess, that schools can pay up to $50,000 for a $10 million insurance policy to protect student athletes for future earnings. Now, that sounds very much like pay for play. You're paying the insurance premium so that they will play at college and not in the pros. Doesn't that undermine the amateur status theory you have? Well, I'll say two things, Mr. Chief Justice. First of all, one can dispute whether one particular line or not is drawn in the right place. But the notion that this particular rule, and I'll explain its rationale in a minute, which allows... You'll explain it in less than a minute. I'll explain it in less than a minute. That loss of value insurance, which has been provided in a few instances by some schools administering their student activity fund, is a form of insurance against injury, just like disability insurance and extended medical insurance. It is a cost of participating in athletics that permits athletes who want to receive an education instead of pay for their play can continue to do so. Thank you, counsel. Justice Thomas? Thank you. Thank you, Mr. Chief Justice. Mr. Waxman, just a matter of curiosity to me. You've put a lot of weight on focus on amateurism. Is there a similar... And you look at the limitations of the benefits or pay to players. But is there a similar focus on the compensation to coaches to maintain that distinction between amateur coaches, coaches in the amateur ranks, as opposed to coaches in the pro ranks? Thank you, Justice Thomas. So the NCAA previously had a rule that limited the amount of compensation that coaches could receive. It was challenged in the Tenth Circuit in a case called Law v. NCAA. The NCAA sought to defend that rule on the amateurism principle. And what the Tenth Circuit said was, look, rules that are reasonably designed to protect the amateur status of student athletes should be upheld in the twinkling of an eye. But coaches are not student athletes. They are professionals, just like professors and presidents. And therefore, the court applied full rule of reason review and struck down the limitation on coaches. So the NCAA is no longer permitted under the antitrust laws from in any way restraining the salaries of coaches and other professionals. Well, it just strikes me as odd that the coaches' salaries have ballooned, and they're in the amateur ranks, as are the players. But be that as it may, in border regions, at least as I read it, where the NCAA also defended the amateurism interest, did we conduct a deferential quick look review? Well, Mr. Chief Justice, the amateurism rules, the eligibility— Thank you for the motion, by the way. I'm sorry, but I'm sure you would be terrific at that. Justice Thomas, let me just say— There's no opening, Mr. Waxman. There's nothing more I can say that will not get me into trouble, so let me answer Justice Thomas's question. The rules that were challenged in border regions were a particular restraint on the number of televised games that the NCAA would allow its teams to hold. And what the court said is, number one, because this is an industry in which agreement is necessary for the product to exist at all, we will apply the rule of reason. And we will apply a full rule of reason inquiry into the pro-competitive benefits of the television rule because they do not fit the mold of the core rules that define the product itself, that is, the eligibility rules that require that contestants be students and amateurs. And it's from that that both we and this court in Section 6 of American Needle derive the principle that when a rule on its face is shown to advance the principle of amateur athletic competition, it should be withheld in the so-called twinkling of an eye. Thank you. Justice Breyer? I have two questions. The first one is, what is it precisely that you are complaining about in this court? From much of what has been argued, I thought it was the injunction part on pages 119A, 47A, and 208A. And the injunction and the court of appeals seem to say, NCAA, you cannot limit giving them musical instruments, computers, et cetera. And then they add the cost of post-eligibility internships, vocational schools. Does that mean like law school? And they have a couple other things. Is it that you just think these, you know what the latter things are. They're in your mind. Okay. That could be hundreds of thousands of dollars. I mean, law school is expensive. I don't know if it's a vocational school. They could be. They could be very, very expensive. So that limit may come close to saying, NCAA, you can let these schools get away with murder in terms of what they give the athletes. And you have to. Or they might be some minor thing. But is that what you're attacking? Or you are attacking other things as well? Or what? Justice Breyer, let me start with the general and proceed to the particular. Your first question is, what is it that you're complaining about? We think that antitrust courts lack the authority to redefine the central differentiating feature of the NCAA's pro-competitive product, particularly where the history and context shows so plainly. Yeah, yeah. Well, I understand that. But I say it has to end up in something. So they're telling you to do something you don't want to do. What is that thing they're telling you? They have imposed in this decree, which is on page 167A to 170A of the appendix to our petition, they have imposed a regime in which student athletes can be paid large sums of money on account of their athletic performance, which does not distinguish college from professional sports, much less as effectively as the challenge to rule. Division I allows you to do it. What's the line? What's the sentence that allows you to do that? Because I felt the Court of Appeals was saying, no, it doesn't let them do that. It doesn't do that. I'll give you three examples if I have the time. Number one, the court now says that we cannot restrain schools from awarding to every Division I athlete just for being on the team $5,980 per year, God help us. That is nothing but pay for play. Number two, that we have to, we cannot restrain, put in any way, any limit on the number of post-eligibility paid internships that student athletes can receive. With respect to the long laundry list that is reflected in paragraph two, what the court has said is, we cannot place any limits on anything that can be deemed an educational, is, quote, related to education when in the present world, as the district court recognized, we permit student athletes to receive the actual and necessary educational expenses, including every single one of these things, provided that they are actually necessary and reasonably limited. And the court said, no, you can't place any limit on that. And we can put labels aside that permit schools to allow pay for play. And the reason why we need to allow the NCAA to continue to enforce the amateurism principle, which is well understood, is, in fact, illustrated by Justice Thomas's point about the college coaches. We know what happened to college coaches' salaries when the court struck down the NCAA's rules limiting those salaries. Thank you, counsel. Justice Alito? Mr. Waxman, let me put on the table some of what is said by those who challenge your idea of amateurism. The briefs that are submitted in support of the respondents paint a pretty stark picture. And they argue that colleges with powerhouse football and basketball programs are really exploiting the students that they recruit. They have programs that bring in billions of dollars. As Justice Thomas mentioned, this money funds enormous salaries for coaches and others in huge athletic departments. But the athletes themselves have a pretty hard life. They face training requirements that leave little time or energy for study, constant pressure to put sports above study, pressure to drop out of hard majors and hard classes, really shockingly low graduation rates, only a tiny percentage ever go on to make any money in professional sports. So the argument is they are recruited, they're used up, and then they're cast aside without even a college degree. So they say, how can this be defended in the name of amateurism? Well, let me respond. I mean, there is a healthy debate going on in legislatures around the country over whether college athletes should, as a matter of principle, be paid. Our view, and that is not an antitrust question, our own view is if you allow them to be paid, they will be spending even more time on their athletics and devoting even less attention to academics. But the NCAA has rules limiting to 35 hours a week the number of hours that a Division I athlete can spend. And this applies to all Division I athletes, just not in the two sports in a few schools that happen to make money. You say that the schools are making billions of dollars on this. There are 1,100 schools that belong to the NCAA. Twenty-four, or in some years, 25 schools make money on their athletic programs. The rest of the programs are subsidized by general revenue, student fees, and tuition. And the notion that they graduate at lower rates and they have post-outcomes is contrary to the evidence in this case. Well, what you say is true of the thousands and thousands of real student athletes, but what's the graduation rate for football players in the power conferences? You know, I can't cite you from memory the statistics. Professor Heckman, who was one of the witnesses at trial, testified. And all I can remember is that what he said, and there is support for this in independent studies in some of the amicus briefs supporting us, are that Division I athletes graduate at higher rates than students who are not athletes and have better outcomes following graduation. The athletes and the crew and the fencing, but for the powerhouse basketball and football programs, it's different. Let me squeeze in one more question, which goes to the heart of what I'm wrestling with. You say that what's distinctive about your product is that your players are not paid, and that was true 100 years ago. But in fact, they are paid. They get lower admission standards, they get tuition, room and board, and other things. That's a form of pay. So the distinction is not whether they're going to be paid, it's the form in which they're going to be paid and how much they're going to be paid. Isn't that right? It is not right. The NCAA for decades has defined pay to mean compensation in excess of two things. Number one, allowances for educational expenses, and educational can include both academic and athletic. That is the reasonable and necessary expenses to obtain an education. And number two, certain sort of token prizes and awards for exceptional performance that are characteristic of amateur leagues. Thank you, Mr. Waxman. Thank you, Justice Alito. Justice Sotomayor? I thought, Mr. Waxman, that the district court's injunction only prohibits the NCAA from limiting education-related expenses. It does not prohibit the conference from doing so. So if your priority is maintaining amateurism in college athletics, and you and your members think that increasing education-related benefits will undermine the spirit of amateurism, why don't the conferences impose those limits? I mean, I think this court gave the answer to that question, Justice Sotomayor, in Board of Regents, which is this is a classic example of a prisoner's dilemma in which national agreement is the only solution. There is no doubt that what has happened with respect to the pay of college coaches and other professionals will happen if conferences or individual schools are permitted to remove these restrictions. I'm sorry, continue. No, I'm sorry. I believe that's a sufficient answer to your question. Maybe it's not sufficient, but it's my answer to your question. It didn't seem to me that either the Ninth Circuit or the district court prohibits the NCAA from limiting educational-related expenses to those that are reasonable. So all of your parade of horribles, the government says, are taken care of by that limitation. If you think that internships should be related in some way to the educational experience, you could pass rules to that effect. So why doesn't that take care of your parade of horribles? Justice Sotomayor, you keep saying reasonable educational expenses. What the decree says is that we may not limit in any way compensation or benefits that are in any way, quote, related to education and includes, and no one disputes this, the fact that we may, that school, under her decree, schools may provide $5,980 per year to every Division I athlete just for being on a team. And once a court gets into line drawing in this respect, the litigation and level of judicial superintendents is inevitable. And so why $5,980? As if this court were firm, within a month there will be another lawsuit in addition to the two that are already now working their way through the district court in Oakland, which will say, number one, well, we have an expert who says that we don't think that consumers would be that bothered if it were $8,000 a year. And so we want $8,000 a year to be imposed. And by the way, we also want treble damages for the fact that for all these years, we haven't been getting our $5,980. The district court says no limits whatsoever on a post-graduate internship. The next lawsuit says we want treble damages because we weren't given unlimited post-graduate internships. And then there's another lawsuit that says, well, why does it have to be just post-graduate internships? Thank you. Justice Kagan? Mr. Waxman, the way you talk about amateurism, it sounds awfully high-minded, but there's another way to think about what's going on here. And that's that schools that are naturally competitors as to athletes have all gotten together in an organization, an organization that has undisputed market power, and they use that power to fix athletic salaries at extremely low levels, far lower than what the market would set if it were allowed to operate. So why shouldn't we think of it in just that kind of way, that these are competitors all getting together with total market power, fixing prices? Well, I think the first answer I would give you is this is not some product, some differentiated product that has just been created, and we're now testing whether or not it was adopted in good faith. We're talking about a product that was created 116 years ago in response to abuses that were occurring as a result of instances of professionalism in athletics in order to restore integrity and the social value of college athletics. And we're talking about a product that was created almost 100 years ago, Justice Brandeis in Chicago. You can only ride on the history, I think, Mr. Waxman, for so long. I mean, a great deal has changed since 100 years ago in the way that student athletes are treated, and I'll take you back to Justice Alito's question and the kind of payments that they're given. You know, a great deal has changed even since Board of Regents, let alone 100 years ago. So I guess it doesn't move me all that much that there's a history to this. If what is going on now is that competitors as to labor are combining to fix prices. So, look, the way that the rule of reason applies here, this court has said, because sports leagues produce a product that can't be produced without agreement. And this is, as your question points out… Well, for sure, that's true about some things. I mean, you know, sports leagues have to get together to figure out the rules of the game, how many people are going to be on the court at any one time. So, of course, there are things that there needs to be cooperation for. But why does there need to be cooperation on the cost of labor? Because the cost of labor in this unique instance is what is the differentiating feature that provides a pro-competitive product. So I think if that were true, Mr. Waxman, you would have an argument. But as I understand what the trial court did here, it basically took a lot of evidence as to that question, as to whether the lack of pay-to-play was anything that consumers wanted. And what it found was that consumers didn't really care about that. The other side's experts found, on the basis of survey evidence and so forth, that payments of $10,000 or more would not affect demand. Your expert failed to show anything to the contrary. Essentially, you're saying that the differentiating feature is the lack of pay-to-play, but the evidence in this trial suggested exactly the opposite. So the evidence in this trial very much did not suggest exactly the opposite. And just to take one example, when their survey expert tested people's reactions to giving them a $10,000 academic award, something like 10% of the respondents said that they would be less interested and would watch less if that's the case. The question, the fact that pro-competitive differentiation is not necessarily measured by net consumer demand. The independent value of preserving consumer choice is not the value of maximizing consumer interest. Otherwise, you wouldn't have specialized products. Mr. Waxman, it seems to me you start in a place that I can readily sign up to, which is that joint ventures often need to have agreements that would otherwise look any competitive, whether they're territorial allocations or price agreements, in order to create a product that wouldn't otherwise exist. And we usually give that a pretty quick look, maybe even a twinkling of the eye. So that all makes sense to me. And we certainly don't want to go back to the bad old days of reviewing any joint venture agreement that restricts competition through per se analysis or something that looks like a strict scrutiny analysis, which I understand you condemn the Ninth Circuit for doing. So I understand all of that. I think the trick comes, for me at least, sort of where Justice Kagan was alluding to, which is here the agreement that's really at the center of the case is an agreement among competitors to fix price with the labor market, where you have monopsony control. And that's unusual. The normal joint venture is in a competitive market, but here the NCAA has monopsony control over labor price. There aren't other leagues that might compete with the NCAA that might allow payments, and that's consumer demand that way. So why isn't the monopsony control over the labor market at least an appropriate basis for a more searching rule of reason analysis? Thank you, Justice Gorsuch. So let me be very clear. Given that this is the rare product that is defined by the restriction on competition, we're not saying that it's not appropriate for a court to examine, in whatever detail is necessary, whether the product really is pro-competitive. But if it is, and in this case there is an agreement that the inquiry at step two is our product differentiating and pro-competitive, everyone agrees that the answer is yes. Once that is a given, where there is no plausible argument that the challenged rules aren't reasonably related to the amateur status of student-athletes, which is the differentiating feature, we think that abbreviated review is all that's necessary. And that's a principle that the Fifth Circuit in McCormick, the Third Circuit in Smith, and the Seventh Circuit in Depth applied, and we think that was blessed by this court in American Needle and looking to and quoting the relevant language from Board of Regents. I guess I'm not sure I heard a direct response to my question. In that case, I apologize. No, no, no apologies. Let's just drill down a little bit further. I guess what I'm trying to ask you, and maybe I did sell it artfully, is whether the fact that the NCAA has monopsony control over the labor market is the sole purchaser of the labor. Does that make a difference in what would otherwise be a forgiving rule of reason analysis to a joint venture? I see, I see. So it makes all the difference in the world for purposes of step one of the rule of reason, which is that as this case comes to this court, there's no dispute that the no-pay-for-play rule imposes a significant restraint on a relevant antitrust market. Just as, and as this case comes to this court, there is no dispute that those restraints have a substantial pro-competitive benefit. And so the inquiry, the question of what level of inquiry is appropriate in applying the rule of reason rests, in this case, on step three. Thank you. I hope that answered your question. Thank you very much. My time's expired. Thank you, Chief Justice, and good morning, Mr. Waxman. I want to pick up from Justice Kagan and Justice Gorsuch and identify some issues of concern to me as I look at this. I start from the idea that the antitrust law should not be a cover for exploitation of the student-athletes. So that is a concern, an overarching concern here. I see your rhetoric and tradition and history argument as being very similar to the arguments that were made for exempting baseball from the antitrust laws, Flood v. Kuhn, federal baseball. And that exemption has not been replicated in other sports and other cases. And then in Regents, as Justice Kagan said, that really was from a different era. It was DICTA, not sure it was fully considered DICTA, and in any event from a different era. So then we get to regular antitrust law, rule of reason, and I just want to drill down on your asserted pro-competitive justification and how you say the product is differentiated. It does seem, as Justice Kagan and Justice Gorsuch suggested, Justice Alito, that schools are conspiring with competitors, agreeing with competitors, I'll say that, to pay no salaries to the workers who are making the schools billions of dollars on the theory that consumers want the schools to pay their workers nothing. And that just seems entirely circular and even somewhat disturbing. And then, as Justice Kagan says, it's not even factually supported in the record in this case. It seems to blend back to the tradition argument. All things circle back to this idea, well, just don't worry about it. College athletics is different, just like baseball. So those are the concerns I have initially. Interested in your response. Well, those are a lot of concerns. I hope I can remember them all and address them all. The notion that these amateurism rules were imposed or constitute a cover for exploitation of athletes is A, wrong, and B, not an antitrust issue. It may very well be a policy issue that policymakers like legislatures can address about whether they think the amateurism model that is, as the economists supporting us say, has produced perhaps the most pro-competitive product in American industrial history is worth it. We are not asking for an exemption from the rule of reason. There is no question that, as the court said in Board of Regents, because this is a product that can't exist without agreement, the rule of reason applies. And our position is, and this I think goes to your, well, let me just say that we think that, Board of Regents is 37 years old, but we think that the observation that the court made in Board of Regents about the value that consumers place on the tradition of amateur intercollegiate athletics is just as true today. And again, adverting, as you did, to Justice Kagan's point, even assuming that the evidence in this case supported a conclusion that consumers would be just as happy if athletes were paid or athletes were paid $10,000 a year for just being on the team, that doesn't defeat the fact, the pro-competitive benefit that we provide. But if the consumers don't care, I mean, you said earlier this would allow the players to receive $6,000 a year, as if that were some exorbitant amount when the TV contracts are in the billions. $6,000 a year is not a lot, given the time and the injuries and the inability to go to class or to major in the thing they want to or to do summer jobs. I mean, you're talking about $6,000 as if it's some exorbitant amount. Look, we have rules, and there is a very, very clear and stable line that defines the feature of our product. The amount of hours spent and what majors they pick and all that sort of stuff applies to every Division I athlete in all 24 NCAA division sports. And if there is a problem with the NCAA enforcing its hours restrictions or in some way disadvantaging students who happen to be athletes, that's not an antitrust issue. Thank you, counsel. Justice Barrett? Good morning, Mr. Waxman. Good morning, Justice Barrett. I'd like to return to Justice Alito's questions to you in which he said that tuitions and all of these educational in-kind benefits really are a form of pay. When you answered and you said it's not pay because the NCAA has defined pay as the reasonable and necessary expenses to obtain education. But I'm wondering, why does the NCAA get to define what pay is? And I think, you know, this is based on experience, certainly plenty of parents and students. I mean, some people want to play in college for the love of the game. Some people think they'll be able to go pro. A lot of people do it because they want to be able to afford college educations or, you know, get the in-kind benefit equal to, you know, say, $30,000 or $40,000 worth of tuition. So why do you get to define what pay is? Well, I think there's the general principle, Justice Barrett, is, and I think this is simply received wisdom for antitrust law purposes, is producers get to define their product. They get to define the features of their product. We have long defined our product to exclude from pay the reasonable and necessary expenses of obtaining an education. We give scholarships and we have student assistance funds for all kinds of students, whether they're athletes or not. Our definition, which has been stable over decades, long predating Board of Regents, is that it is, you're not being paid to play if you receive an allowance for the actual and necessary expenses of your education, whether those expenses... And is that how you would define an amateur as someone who is unpaid? Because I think that gets back to the point of, is it a pro-competitive or a legitimate pro-competitive justification to say that consumers love watching unpaid people play sports? Yes, indeed. In fact, in Board of Regents, and in fact, even in the majority opinion in O'Bannon, the court said that the principle of amateurism is well understood, and it means in both cases, they said, you are not paid for play, but you may receive the expenses of obtaining an education. And in fact, in O'Bannon, the reason that the court struck down a since abandoned rule of the NCAA that prohibited schools from making athletic scholarships up to the full amount of the cost of attendance was that the Ninth Circuit said, well, even the NCAA admits that that is not a rule that distinguishes amateurs from professionalism because the cost of attendance is the expense of an education. So yes, that is our line. I want to shift gears, Mr. Waxman, and ask you about the effects that ruling against you might have. So you told Justice Thomas that the ballooning of coaches' salaries is attributable to the ruling in the Tenth Circuit that they can't be kept under the antitrust laws. So if we rule against you, what's the impact of the decision that you're making? Well, Title IX is an independent mandate, and, you know, the schools have to, obviously, have to adhere to the Title IX mandate. The evidence in the case showed that if schools were, in fact,  the kind of payments that the district judge imposed in her final decree, schools, I mean, they have to come up with the money somewhere that, you know, the $6,000 a year amounts to $735 million per year that schools have to come up with in addition to the retrospective treble damages awards. And the evidence was that schools would, per force, reduce the number of, quote, non-revenue sports, men's and women's sports, thus reducing the advantages and offerings available to student athletes in those other sports. I mean, I think my point about what the consequences are is I think we can see in the Ninth Circuit what the consequences of allowing district judges to hear evidence in successive cases, well, people don't care about this or people don't care about that, and so raise the line. I'm sorry, Mr. Waxman, my time expired. Oh, I'm so sorry. A minute to wrap up, Mr. Waxman. Thank you, Mr. Chief Justice. For over 100 years, the NCAA has administered pro-competitive amateurism rules needing to account for multiple constituencies and changing circumstances, as the questions today illustrate. It offends the antitrust laws for a court to appoint itself as a superintendent to second-guess those judgments, blurring the distinction between college and professional sports and facilitating successive lawsuits and treble damages award, all based on supposed evidence that an alternative regime of the courts devising wouldn't diminish net viewer interest. This is the one and only case in the history of the Sherman Act ever to strike down restraints that are what differentiates the product, and particularly in the unique circumstances here, it was manifest error to do so. Thank you. Thank you, counsel. Mr. Kessler. Good morning, Mr. Chief Justice, and may it please the court. The naked, horizontal, monopsony restraints that the competing NCAA schools have adopted in these labor markets would be per se unlawful in any other context, but under Board of Regents and American Needle, the need for the NCAA schools to cooperate leads to the conclusion that the rule of reason applies. The courts belong to recognize this, and as a result, petitioners have ample latitude to prove a pro-competitive justification for all their restraints. Petitioners' complaint is not a legal one. It's that they lost on the facts, but that is not a basis for appealing to this court. For five decades, the NCAA has argued that economic competition among its member schools would destroy consumer demand for college sports. In Board of Regents, it was competition for TV broadcasts. In the law case, it was competition not for all coaches, but for assistant coaches' salaries. In O'Bannon, it was name, image, and likenesses. Each time, the courts struck down the restraints under the rule of reason, and history has proven the courts were correct. Demand for college sports continues to flourish. And by the way, this has never been stable. As recently as 2015, the NCAA has refused to provide even the most basic cost of attendance for the athletes. This case is more of the same. It is just the latest iteration of the repeatedly debunked claim that competition will destroy consumer demand for college sports, and that the NCAA should have a judicially created antitrust exemption because of an imaginary, revered tradition of the NCAA. The thing that concerns me about your approach that was adopted by the court below, the NCAA has a number of limitations that are designed to ensure that its product is amateur athletic competition. And you look at, and the district court looks at one rule, and let's say it's a limit of $2,000 for something, and you say,   with $2,000. That's the perception of what's going on. But then you go on to another rule and fiddle with that in the same way, and another one and another one. And it's like a game of Jenga. You've got this nice, solid block that protects the sort of product that schools want to provide, and you pull out one log of the prevailing law. What the district court did is it tested factually whether the NCAA could prove a pro-competitive justification for all of its rules together and found that it failed. It then looked and said, can it justify some categories of its rules? And it found that it succeeded. Then at step three, we had the burden to show it was patently restrictive and necessary so that there were substantially less restrictive alternatives available. And the basic alternative the court imposed was not to micromanage. It was a general rule that there's no justification for limiting education-related benefits, because after all, what the consumers and others care about is they be students. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Briefly, Mr. Kessler, just following up on what you just said, what if you have a consumer survey that suggests tomorrow that the consumers think it's fine for amateur athletes to make $20,000 a year? Would we be back in court with litigation about that, as opposed to the $6,000 a year? I do not believe that is correct for two reasons. First, the step three burden is to show that the rules are patently and inexplicably restrictive and necessary, and that it has to be a substantially less restrictive alternative. That type of small versions are never going to pass that test. But more importantly, here, the court did not set this $5,900 limit. The NCAA did. What the court found is the NCAA allows those types of payments for athletes for performing on the field, pay for play. And since the NCAA did not see any damage to its product by allowing a star player to make that for winning a ball game, for being an MP... I'm sorry to cut you off, Mr. Kessler, but that sounds fine for the upper level schools, whether it's, you know, Alabama, Ohio State, and Nebraska. But it doesn't... For the schools that have more modest circumstances, it would seem that they would begin to... The bigger schools would begin to cherry pick with the transfer portal. The athletes from the lower schools, simply because they're able to afford this income that you're talking about. So have you considered that as a problem in an environment where you're trying to maintain competitiveness and amateur status? So there's a reason, Your Honor, that the NCAA doesn't assert competitive balance as a defense in this case. And that's because those schools don't compete now. Now Alabama pays its weight coaches $700,000 a year. None of those small schools can do that. They build palaces. What these competition restraints do is they divert the big schools' money to these other areas to compete. But it doesn't change the competition. And remember, this injunction doesn't require one school to pay anything. It simply says the NCAA can't prohibit it, but the competitors can. So for example, the Patriot League doesn't even allow their schools to pay athletic scholarships. Conferences can adopt for the smaller schools. Justice Breyer? I think if we really have a case here, it's a tough case for me. And the reason it's so tough for me is because this is not an ordinary product. This is an effort to bring into the world something that's brought joy and all kinds of things to millions and millions of people, and it's only partly economic. Okay? So I worry a lot about judges getting into the business of deciding how amateur sports should be run. And I can think of ways around that. First, you could just say it's a different kind of product. This is what you would lose on this. Second, you could say that consumer demand is not at all the only criteria. You could have a purple widget joint venture, and you say nobody can make red widgets, and I'm sorry, they can't. Even if consumers were just as much like red widgets, because it's a purple widget joint venture. Or you could say this is a rule of reason. Take into account other things. Take into account administrative problems in working out these rules for the NCAA. And the fact that nobody can work with 40,000 professors in schools and everybody thinking something different, you're going to obviously end up with something of a mess, and it's a tough problem for them. Now, having thought of four or five different ways by means of which you lose, I also think I'm very worried about my ways. Because how do I do it? If I say these things, I might be also affecting the real economic joint venture like four technology companies. Now, I'm telling you my real thoughts, and I'd like to hear your and also Mr. Waxman's response. Your Honor, first I would say that I do believe under the rule of reason and the antitrust laws, the pro competitive justification must be competition enhancing. That's what Board of Regents says. That's what the unanimous decision in American Needle says. That's what professional engineers says. Every case has said that, and the reason is, if there's something special about the NCAA that deserves not to be subject to the antitrust laws, that's a congressional policy determination. It's not something this court has the ability to weigh against the competition mandate that's under the rule of reason. I would also say, Your Honor, we have looked at these claims from the NCAA over and over again that each loss was going to hurt college sports and destroy this revere tradition. It's never happened. Justice Alito? Do you think that the product that is produced by the top football and basketball schools has a distinctive characteristic, and if so, what is that characteristic? I think it is what the court found is that students play in the games, which is a distinction from professional sports. I think that's what all their witnesses and the NCAA testified to. That's what the survey evidence suggests. So I believe that is the distinction, and of course, we're not challenging any restrictions or rules regarding that they have to be students, and in fact, the education-related benefits here would help them to succeed as students. Do you think there's any that the NCAA could put any limitation on? Educational benefits for which athletes could bargain? I think the injunction allows the NCAA, and this was alluded to, to set reasonable rules to define what the education benefits are and how they are related to education. They also were given the rights under the injunction for rules as to how the benefits would be provided. So I think the court gave a lot of discretion to the NCAA in a way that will still allow for there to be competition in making a better education experience for the athletes, which Mark Emmett, the president of the NCAA, publicly declared after we won that this was a good thing. Do you think that what the district court allowed here and the Ninth Circuit sustained is the outer limit? Would the antitrust law allow applicants, student, recruited athletes to bargain for, let's say, a guarantee not to lose a scholarship if they're injured, a guarantee of tuition, room and board for a certain number of years after eligibility so that they would be able to graduate, the provision of tuition, room and board for graduate studies, is there a limit? So I believe what the antitrust laws do is prohibit the NCAA from having restrictions that can't be justified under the rule of reason. If they had a restriction, for example, that said colleges could not provide a four-year or five-year guarantee that their scholarship would stay in place, I believe that might not survive rule of reason scrutiny. But the antitrust laws don't compel schools to do anything. The idea is allow the markets to decide  have the choice to provide. Justice Sotomayor? Counsel, you declined to cross-petition the judgment below, correct? Yes. So for purposes of this court's review, you are not asking for any broader relief than that already provided by the district court, correct? That is correct, Your Honor. You're not asking us to address the issues that Justice Alito or others, including Justice Kavanaugh, have raised on whether or not there should be any limits, educational or not educational? You're happy with the injunction you got? We are not asking for broader relief than affirming the rulings below. All right. Number two, generally speaking, antitrust courts do not get into the business of price administration. Why are the limits of the injunction below of academic achievement awards at a fixed price of $5,980, not a de facto price setting? So the entity who set that price was the NCAA. What the court simply said is that whatever the NCAA rules allow, to give to athletes now in a pay for play, if you win a ball game, if you're the MVP, if you have some other achievement, they allow you to get $5,980. The court said then you can't NCAA use your monopsony power in a labor market to prevent the schools and conferences from giving as much, not more, as much as they already allow. So this is not judicial price fixing. This is just taking the NCAA's determinations and saying you can't justify a restraint on education achievement. And I also would note, it's not just for being on a team. With all due respect to my colleague, it has to be for academic achievement. And the conferences, for example, could individually say it has to be a 3.0, or you have to make progress to get your degree, or other things. It's not just for being on a team. Justice Kagan? Mr. Kessler, I recognize you didn't cross petition, but I can't believe you think this $5,980 award was the limit of where the district court could have gone. On this record, how high could the district court have gone before compromising consumer demand for college sports? Your Honor is correct. We advocated for broader relief below. We advocated the NTAA should not impose the restriction. It should be left to the individual conferences who don't have market power to decide if any rules were needed. Secondarily, we put in consumer survey evidence that at a minimum showed that consumers said they were perfectly fine, they would keep watching sports if they got a $10,000 award for academic achievement. You think the evidence you put in allowed a $10,000 award? Absolutely, Your Honor. Did it allow more than that? Or would you say that was all the evidence indicated? If I said $15,000, is the evidence support going up to $15,000? We did not put in a survey evidence for more than $10,000, but what we did put in is that the schools already do like $50,000 for protection against lost professional earnings, and that's had no impact on consumer demand. Your answers here raise two questions, Mr. Kessler. The first is what you've heard before from some of my colleagues, a kind of floodgates argument, like what's next? It's just going to go up and up and up, and pretty soon it will just be a regular labor market. And the second is, isn't there some kind of arbitrariness about this $5,980 award that we should react badly to? I don't believe so, Your Honor, because if you view the reward, it doesn't even mention the dollar number. It simply says the NTAA cannot set a limit on academic achievement awards that is lower than what it allows for the greatest example of pay-for-play, which is giving cash awards. Justice Gorsuch? Mr. Kessler, I'd just like to talk about antitrust law generally for a moment and pick up on where I think the Supreme Court has come to recognize that we shouldn't be fly-specking individual aspects of covenants not to compete amongst joint venture participants because they're creating a new product that wouldn't otherwise be available in a joint  case. What, in your view, as a matter of law, forget about the facts for a moment, makes that kind of searching inquiry appropriate? So I believe, Your Honor, that the Court has been very consistent in every joint venture case, whether it is American Needle or whether it is  venture case. And the rule of reason we have found can accommodate that. That's been a hundred years of jurisprudence. Let me just stop you there. Does it have something to do with the fact that this product market, there's no way for competition to show if the NCAA's ever-shifting decisions, not stable     is pro-competitive or not competitive. And the rule of reason is that there is no competition in this market. It is not pro-competitive. It just can impose its will. And under rule of reason, we do balance things together. Ultimately, it's a balancing analysis, and the greater the market power, the collective market power in this labor market, I do believe that justifies at least the  of the traditional rule of reason, which is all that was applied here. And in particular, your honor, I think footnote six of American Needle directly addresses this, where the NFL said, well, we have to define our product as NFL football, and the court said, of course you have to define your product as NFL football, but that doesn't entitle you not to be subject to the normal rule of reason. First, you agree that the NCAA can require that the athletes be enrolled students in good standing, correct? Yes, I do, your honor. As Justice Sotomayor and Justice Kagan raised, I think we need to think about what the next case would look like if we rule in your favor in this case. As Justice Sotomayor correctly pointed out, you're asking for a narrow ruling here, but the rationale behind that ruling could generate follow-on litigation. What in your view is the end game of this litigation, not this particular litigation, but of future litigation? Is the end game   the rule of reason? Your honor, it's difficult for me to predict legislation or collective bargaining, but I would talk about antitrust end game. In the antitrust end game, it's simply to apply the rule of reason, which the antitrust end game is. I lost that as a matter of fact, and they now won on that issue twice as a matter of fact under the rule of reason, and facts would probably have to change further for a different result to happen. If there are new material facts in the future, then we know under antitrust law, the rule of reason could come out differently, but I have no reason to think that I would win today on facts that I just lost on yesterday. Thank you. Justice Barrett? Mr. Kessler, the tenor to me when I read it is that they were trying not to do too much, and this goes back to Justice Breyer's description of this is a delicate area. There's concern about blowing up the NCAA and messing up general antitrust law. It seemed to me the lower court opinions were in  lower court opinion. You're saying the educational expenses weren't that big of a deal, the cash wasn't that high in an amount. You yourself described the injunction as narrow and an effort by the court to give the NCAA as much leeway as possible. Given all of that, how is the injunction a substantially less restrictive alternative? Or do you disagree it had to be less restrictive? I believe it was less restrictive. It said there are life changing benefits for these athletes that will be provided. The vocational schools we're talking about, if you don't graduate as many of these athletes don't, then maybe you'll have a career after earning all of these billions of dollars. The NCAA won't allow that. It's life changing if you can get a local internship which every other student can get on campus except for these athletes who work 50 hours a day. Most importantly, it's what the facts led to on the normal traditional rule of reason analysis. A minute to wrap up. Mr. Kessler. The district court found that the NCAA restraints on education related benefits cannot be justified as reasonably necessary to maintain demand for college sports or define the NCAA's product. This court should not create a special judicial antitrust exemption based on any claims that the NCAA is somehow special. That is for Congress, not the courts. The rule of reason already provides ample attitude to joint  to identify the restraints you need. And Twombly allows the dismissal of claims at the outset so  be no parade of horribles if someone challenged a rule that was pro competitive on its face and did not cause anti-competitive effects. Finally, your Honor, as footnote 15 of Board of Regents says, when you have fact findings of a district court approved by a court of appeals, this court should not second-guess those findings. And here, this was found to be an unreasonable restraint of trade. Thank you so much. General Prelogger. Thank you, Mr. Chief Justice, and may it please the court. The rule of reason is the traditional standard for assessing antitrust liability. Usually, a per se rule would prevent competitors from arguing that their horizontal agreements not to pay their workforce are pro per  rate. The court has used this opportunity to show that its compensation rules fuel consumer interest in college sports as a distinct product. And the court upheld most of the challenges under the rule of reason. Petitioners now seek to avoid the possibility of a case involving horizontal price fixing in the market for student athlete labor where the NCAA has monopsony power would not be the place to start. Thank you, counsel. Thank you, general. You frequently emphasize that the restrictions imposed by the court below were modest ones. But I don't think the principle was. And when you go through, as I was mentioning to your friend, there will be a wide number of rules that are subject to challenge if not in this litigation and subsequent cases. And the effect, it seems to me, is to substitute the court's view for the business judgment of the people responsible for a joint venture that we have upheld as pro competitive. I don't know if the judge is the best person to assess the competitive effect of the rules or the people managing the joint venture. Do you have any thoughts about that? I think the legal standards themselves guard against having courts come in and micromanage the rules of the NCAA. There are two aspects to that. The first is the fact that the rule of reason applies in the first place. Plaintiffs won't be able to benefit from any per se or categorical rules. They'll have to meet their step one burden. That's an important check because plaintiffs won't be able to show that. The second part of the legal analysis is the step three inquiry into a less restrictive alternative. The lower courts were not seeking to impose marginal rule changes on the NCAA. They said this was a more restrictive set of rules than was necessary. I think applying those legal standards is not going to lead to courts trying to dismantle the NCAA rule by rule. I'm still a bit perplexed as to how the NCAA would be able to preserve what it thinks is important, the distinction between student athletes and professional athletes without constantly being involved in litigation. What's your reaction to that? How do we resolve that part of the future problems that I see down the road? I think that the way that that's resolved is by giving credence to the pro competitive justification that was asserted here. The idea that these rules really do help to differentiate the product in the eyes of consumers. Ultimately applying that standard here, the district court upheld most of the rules. It found that with respect to all of the limits on compensation that are unrelated to education, consumers actually pay attention to that. But I think where the NCAA goes wrong is in suggesting that the analysis should be based on its own perspective of what it thinks supports amateurism. It's not something that the competition laws focus on to aspire to in and of its own right. It's not          own right.  not something that  not something that     on to   and of  right. It's not something that the competition laws focus on to aspire to in and of own right. It's not something     focus on to aspire to in   Right. It's not something that the competition laws focus on to aspire to in and of right. Fundamental principles of education have to be legitimate. On this record, do you think a district court could have set limits that were significantly higher? It would have been difficult to set limits on some of these educational benefits that aren't tied to their actual values. I think that's an inherent constraining feature of this injunction. It's true that some of these benefits might be worth quite a lot to the students, but they are limited by actual value. Thank you, General. I have a question about the competition in the labor market against the market for college sports. I understand that's the way the case came to us. I'm wondering if you think it is performing any kind of distorting effect that would influence the way we think about this case in a bad way. This issue of cross-market balancing raises  questions. Ultimately, the parties haven't briefed it. The lower courts didn't consider it. We think the court should take the market definitions as a given here and not consider when and under what circumstances cross-market balancing can be considered. I think the parties took their lead because the court did contemplate that a pro-competitive justification could be based on the idea of preserving college sports as a distinct product. For that reason, I urge the court to leave for another day any broader questions about how cross-market balancing should be conducted. Thank you, General. I'm ready to wrap up, General. Thank you, Mr. Chief Justice. If I could just leave the court with one overarching thought, it's this. Petitioners are wrong to argue that any restrictions related to their conception of amateurism must be upheld without analysis rather than applying the rule of reason. That would be an extraordinary departure from traditional antitrust principles. Amateurism is relevant here only in so far as petitioners can actually show that it increases consumer choice by distinguishing college sports from professional sports. And they made the showing with respect to most of their compensation rules, but in a factual matter they couldn't make the showing with respect to educational benefits. So there is no pro competitive justification to say that an obstinate power does not take away the producer's right to define the product any more for the NCAA than, for example, for the little league, which eight years ago got $80 million for its television contract. There is no argument here that the rule of reason shouldn't be applied. Our point is that the rule of reason  that these restraints be accepted because the product is clearly pro competitive and the court's decree essentially remakes the pro competitive feature of the product itself. Justice Breyer, this is not an ordinary product or an ordinary market. This is education, and cases like Klar's and Goldfarb make clear that where actors are not purely economic but are also attempting to be  with each other. This is as the government acknowledges is a rare case in which the challenged restraint is the pro competitive differentiating feature of the product. Net consumer demand is not the test. Even if the government acknowledges that there is    differentiating feature of  product, it is not the case that the government acknowledges that there is a pro competitive differentiating feature of the product. This    the government acknowledges that there is a pro competitive differentiating feature of the product. Just focusing on differentiation as an abstract conception would allow courts to completely replace differentiation with a different differentiation altogether. Once courts start drawing their own lines, and according to the government here, everything is factual and depends on the record, perpetual litigation and judicial scrutiny are not inevitable. Just the $5980 that has captured the court's imagination this morning requires months of post-trial litigation in front of this judicial superintendent just to figure out what that number is for the time being. Thank you. Thank you, counsel. The case is submitted.